WILLIAM Q. COLE, INSURANCE COMMISSIONER, *v.* STATE OF MISSISSIPPI EX REL. GARRARD HARRIS, DISTRICT ATTORNEY.

[45 South., 11.]

1. MANDAMUS.   *Acts of insurance commissioner.   Judicial discretion.*

Mandamus will not lie to review the judicial discretion of the insurance commissioner in granting a license to an insurance company to do business in the state on the ground that its policies, passed upon by the commissioner, violate a statute; nor, in the absence of evidence *dehors* the policies, to compel a revocation of the license.

2. INSURANCE.   *Contracts.   Discrimination.   Income clause.   Code 1906, § 2600.*

Code 1906, § 2600, prohibiting discrimination in dividends or benefits to accrue on an insurance policy, is violated by policies stipulating for the return to the insurer of an annual income, however small, during a designated time, although the obligation purports to be based on a consideration.

FROM the circuit court of, first district, Hinds county.

HON. WILEY H. POTTER, Judge.

The state, suing on the relation of Garrard Harris, district attorney, appellee, was plaintiff in the court below; Cole, insurance commissioner, appellant, was defendant there. From a judgment ordering the issuance of a writ of mandamus directing Cole, insurance commissioner, to revoke the license to do business in the state previously granted by him to the Great Western Life Insurance Company the defendant appealed to the supreme court.

The questions involved were:

(1) Is the matter of the revocation of the license of an insurance company to do business in the state, like that of granting such license, committed by law to the discretion of the insurance commissioner, and beyond the control of the courts?

(2) Is the matter *res adjudicata* as to everything relating to the form of the contract employed by the insurance company after the license has been granted by the commissioner with full knowledge of the nature of such contracts.

(3) Does the insurance contract under consideration violate § 2600 of the Code of 1906?

The Code section is as follows: " Sec. 2600. *No distinction in same class; rebates prohibited.*— No life insurance company doing business in Mississippi shall make any distinction or discrimination in favor of individuals of the same class and equal expectation of life in the amount of payments of premiums or rates charged for policies of life or endowment insurance, or in the dividends or other benefits payable thereon, or in any of the terms and conditions of the contract it makes, nor shall any such company or any agent thereof make any contract of insurance or agreement as to such contracts other than are plainly expressed in the application and policy issued thereon; nor shall any such company or agent pay or allow as inducements to insurance any rebate of premium payable on the policy or any special favor or advantage in the dividends or other

benefits to accrue thereon, or any valuable consideration or inducement whatever not specified in the policy contract of insurance. Whenever it shall appear to the satisfaction of the commissioner after a hearing before him upon notice that any company, officer, agent, subagent, broker or solicitor has violated any provision of this section, he shall revoke the license of any such company or person to transact business in this state, and no other license shall be issued to any such company or person within one year after such revocation."

The features of the insurance policy to which objection was interposed are as follows:

### " SPECIAL INCOME.

" (1) The Great Western Life Insurance Company hereby agrees to apportion and pay to . . . . the insured hereunder, during the continuance of this policy, the premiums on the same having been paid in full each year as they become due, a special annual income consisting of . . . shares of the proceeds of One Dollar ($1.00) per One Thousand Dollars ($1,000.00) of all insurance, except reinsurance, written by said Company in the United States from the date of its incorporation to the first day of January, 1918, on which premiums, computed on the annual basis, have been received in cash, and also for so long thereafter as premiums ·are received on such insurance; said special income to be determined as follows:

" (2) The total sum of said One Dollar ($1.00) per One Thousand Dollars ($1,000.00) of insurance shall be ascertained at the end of each calendar year and such sum divided by the number of thousands of insurance represented by policies containing this provision. The quotient obtained shall be the apportionment to each such share, and the total sum of . . . such shares shall be the special income payable hereunder upon the succeeding anniversary of this policy, subject to the payment of the premium hereon.

" (3) The total amount of insurance issued in policies con-

taining this provision shall not exceed Fifteen Million Dollars ($15,000,000). Each One Thousand Dollars ($1,000.00) of insurance shall represent one share. No lapsed share shall be reissued to a new policy holder. Shares surrendered by lapse or death shall decrease the number of shares participating and inure to the benefit of the survivors.

" (4) It is understood and agreed that in consideration of the income paid thereunder, the insured will, upon written request, advise the Company as to the fitness and desirability of agents and applicants for agencies, furnish confidentially such information as he may possess regarding the personal habits of applicants for insurance and those of lapsed policy holders who apply for reinstatement, and such information as may come to his knowledge regarding claims against the company which might assist in protecting the company from fraudulent or false claims, or fraudulently acquired insurance."

*McWillie & Thompson,* for appellant.

It will be observed that the matter of the revocation of a license is committed to a particular officer, who is supposed to be chosen with reference to his knowledge and experience in respect to the business of insurance, and that he is not authorized to act until he has given notice to the company or person to be affected by his decision and has had a hearing before himself, which has resulted in his being satisfied that such company or person has violated the statute.

Very early in our judicial history it was held that mandamus could be availed of to compel the performance of ministerial duties only by public officers, and not to control them in matters of discretion.

In 1866 this was held in a mandamus proceeding to compel the auditor of Public Accounts to pay a balance due on the salary of an officer. *Swann* v. *Buck,* 40 Miss., 290.

Iu 1870 it was held that the duty of the chancery clerk to approve official bonds is in the nature of a judicial act requir-

ing the exercise of judgment and discretion in its performance which the courts could not control by mandamus. *Swann* v. *Gray,* 44 Miss., 393.

In 1892 the same thing was held in respect to the action of the president of the board of supervisors in approving or disapproving the bonds of county officers, under the provisions of the Code of 1880. *Shotwell* v. *Covington,* 69 Miss., 735.

As the judgment in this case not only requires the commissioner to act, but provides also *how* he shall act in a matter committed to his discretion, that is to say, by revoking the license in question, we could well afford to suspend further argument on this branch of the question, but will nevertheless devote a few words to the manner in which it is sought to evade the above well established principle.

It will be noticed that although the judgment follows the prayer of the petition and requires the commissioner to revoke the license, it is relied on as simply requiring the commissioner to act in the matter. In other words it is sought to defend an invasion of the jurisdiction of the commissioner under color of the authorities which hold that while an inferior court cannot be controlled in the exercise of its discretion as to how a matter shall be decided, it can be compelled by mandamus to act by proceeding to decide it. The vice in the petitioner's contention is that the effort is not simply to compel the commissioner to decide a matter which it is his plain duty to decide, but to compel him to decide over again in a different way a matter upon which he has already passed, the setting aside of his former decision being necessarily involved.

The revocation of the license is not sought on account of anything that transpired after the issuance of the license, but on the ground that it was improperly issued, or in other words, that the commissioner erred in issuing it. The matter of issuing such a license is, like the revocation of it, one committed by law exclusively to the discretion of the commissioner. Code 1906, §§ 2559, 2606, provide the method of obtaining a license.

The latter section directs what showing in the way of documents, etc., shall be submitted with the application, to which § 2677 makes the additional requirement that " a sample copy of every kind or class of policies offered for sale in this state " shall also be submitted. Section 2606 provides that the company so applying for a license shall satisfy the commissioner that it is fully and legally organized under the laws of its state or government to do the business it proposes to transact, etc., and shall obtain from the commissioner a certificate that it " has complied with the laws of this state and is authorized to make contracts of insurance." By § 2564 it is provided that " Before granting a certificate of authority to any insurance company, the commissioner shall be satisfied that it is qualified under the laws of the state to transact business therein, and as to its financial ability and condition." This last section it will be noted provides for two conclusions, one relating to the legality of the business under the laws of the state, and the other to the solvency of the company.

It would seem that when the commissioner, under the authority vested in him by law, admits a company to do an insurance business in this state of the nature of which a full showing has been made, the matter is entirely beyond the control of the courts.

It has been held in this state that where one has a claim against a county, mandamus is the proper remedy to compel the board of police to proceed to render judgment, but that when a judgment has been entered by the board it cannot be required to enter a new judgment, nor can the circuit court render a new judgment and require the board to enforce it. *Board of Police* v. *Grant,* 9 Smed. & M., 77.

The insurance policy quoted from in the petition is the only one employed by the company in question, and with that policy before him the commissioner declared himself satisfied and adjudged that the company was entitled to do business in this state, accepted its license fee, and issued his certificate. It is now

said that he erred and that he should be required to adjudge differently because he believes that he erred. No matter what he may believe his adjudication must stand, and his defense of this proceeding shows that he has not brought himself to the point of abdicating the functions of his office in favor of the courts, and that he does not propose to undo an adjudication as solemn as any that he could now render. A reading of Code 1906, § 2561, shows in what states of case the courts are to be availed of and through what officers, but those officers are only authorized to act when, called on by the commissioner, and the matter of the revocation of licenses is at the conclusion of the section, expressly reserved to the commissioner.

*Res Adjudicata.* It is not pretended that there is any question as to the validity of the business done by the insurance company in question, save such as arises on the face of the policy submitted with its application, the only policy that it issues, and that the commissioner had before him for consideration and considered before issuing his certificate the very question now presented by the petition for mandamus is also unquestioned. His action on identically the same question when he issued his certificate would, it seems, be a final adjudication of that question and binding upon him as well as exempting him from the control of the courts. He was especially authorized by law to decide the question and his competency being unquestioned and the matter being identically that on which he has already passed, it is wholly immaterial that no provision has been made for an appeal from his decision. The right of appeal exists by the grace of the law and only in those cases where provision is made for it. In some of the states there was no appellate court for many years. It is also immaterial that he may now doubt the propriety of his course in issuing the license. Can it be contended that all judgments that have become final are free from error? On the contrary do not judges sometimes declare that they grievously erred in matters that have passed beyond the control of

any court? It is not permissible to try over again a matter that has been once adjudicated by merely presenting new arguments on the same state of facts, and that is precisely what the relator is now endeavoring to do. *Moody* v. *Harper,* 38 Miss., 599.

If the first adjudication is not final, how often, pray, can the matter be gone into? Suppose the commissioner, as a result of this proceeding, should try the matter over again and reach his original conclusion that the contract is a valid one, would he still remain subject to mandamus in order to try the question a third time? If not, why not? His second decision would be on the same state of facts and supported by the same authority as his first decision. It cannot be that the question of *res adjudicata* can be made to rest on the assumption that on another trial he would decide the question in a particular way, that is to say, contrary to his first decision. An insurance company is entitled to know at some time whether it is licensed to do business for twelve months under the provisions of the Code, and the time when in all fairness and justice it should be able to feel this assurance is when it receives its certificate, as it then begins to make outlays of money and enter into obligations.

The proposition that the courts cannot usurp powers committed to some other authority is so plain a proposition that we cited no authority to support it, but we would refer to a recent case resting upon this doctrine which employs one of the very arguments we have advanced in this brief. We refer to the case of *State ex rel.* v. *Brown,* 90 Miss., 876, where a mandamus was sought to compel an executive committee which had acted under the primary election law on the returns of an election, to reconvene and recanvass the returns. In the opinion in chief, the general doctrine is announced, and in a short concurring opinion WHITFIELD, C. J., observes that if the courts had jurisdiction of the mandamus suit an appeal would lie to this court and on reversal there would be another trial below

and a second appeal to this court and so on, so that the whole time between the two primary elections might be consumed in the litigation, as in this case the whole lifetime of the license, which could not exceed and might be much less than one year, might be consumed while the matter remained in uncertainty.

The first subdivision of the section prohibits dictinction or discrimination in favor of individuals of the same class and equal expectation of life by requiring that the premiums or rates charged or dividends or benefits payable shall be uniform as to such individuals. It will not be claimed by counsel for relator that the company may not lawfully issue all the usual kinds and forms of policies such as ordinary life, endowment, twenty-payment life, etc., etc., and charge different rates of premium for the different kind of policies, *i.e.*, the statute is not open to the construction that a twenty-year endowment policy might not call for a different rate of premium than an ordinary life policy even though the insured were of equal life expectancy, and neither will it be claimed that the dividends or benefits to inure under the endowment policy may not be greater than under the ordinary life policy.

It is not the purpose of the law to require that the charges for life insurance shall at all times be maintained at a uniform rate or that the companies may not, as the exigencies of business may require, increase or lower their rates, the prohibition being only that the rates charged for the time being shall be uniform as to all persons of the same class and expectation of life; neither can it be the purpose of the law to require that the dividends or benefits payable under insurance policies shall at all times remain uniform. Such requirements would at once destroy the business of all insurance companies.

It will be observed that the first subdivision of § 2600 prohibits, *not* such classification and differences in classes as an insurance company may desire to make, but any distinction or discrimination against individuals of the same class and equal expectation of life. It is not pretended that any such distinc-

tion or discrimination has been as yet made. Discrimination cannot exist in the abstract, nor otherwise than relatively, the one being preferred over the other. Some one must be discriminated against or there is no discrimination in favor of some one else, and up to this good hour the company in question has made no contract whereby one policy holder acquired an advantage over any other policy holder, and in order to force it into that attitude we must anticipate the day when the $15,000,-000 mark shall have been reached and assume that the company will still be in operation in this state, that other persons will take the policies it then offers and that these policies will be less advantageous than that now offered.

We can see no reason why a new insurance company may not offer a specially advantageous contract in order to build up its business, and the strength it thus acquires inures to the benefit of all future policy holders.

The intent of the Legislature always controls in the construction of a statute, and to ascertain that intent every clause and word must be taken to have been intended to have some force and effect. This is the general rule, and in respect to provisos and saving clauses creating exceptions, it is held that they must be construed so as to give some effect different from that which would exist without them. 26 Am. & Eng. Ency. of Law (2d ed.), p. 681.

And it is held that when an act expresses a general intention and afterwards a particular intention incompatible therewith, the particular intention must be taken as an exception to the general and both shall stand. *Stockett* v. *Bird's Admr.,* 18 Md., 484.

And a saving clause, in the form of a proviso, in a statute, restricting the operation of the general language of the enact-clause is not void because the language of the two clauses is repugnant. *Savings Inst.* v. *Makin,* 23 Me. (10 Shep.), 360.

As between conflicting provisions of the same statute the last in order of arrangement will control. *Hall* v. *Equator, etc.,*

*Co.,* Fed. Cas. No. 5, 931; *Quick* v. *Township,* 7 Ind., 570; *Ryan* v. *State,* 5 Neb., 276; *Ex parte Hewlett,* 24 Nev., 333; *Packer* v. *Railroad Co.,* 19 Pa. (7 Harris), 211; *Hightower's Lessee* v. *Wells,* 14 Tenn. (6 Yerg.), 249.

The exclusion of one thing in a statute may involve the inclusion of another, as we find in the ruling that the exclusion of the power of a court to impose a fine of less than a specified amount gives, by implication, the power to impose a fine of more than that amount. *Hankins* v. *People,* 106 Ill., 628; *Drake* v. *State,* 5 Tex. App., 649.

When interrogated in the lower court to state specifically in what way the insurance contract in question violated the statute counsel for the petitioner responded that it was because the contract provided for a rebate of premium. We were entirely content with the answer, because, if the statute does anything clearly it permits rebates that are not secret rebates, that is to say, it permits rebates that are " specified in the policy contract of insurance."

The general purpose of statutes of this kind is to prevent secret discrimination and rebates. An insurance company must offer for the time being a uniform contract, and permit its patrons to openly secure the same rates and benefits and not have it possible for a secret arrangement to be made with certain favored individuals to get their insurance at a less cost or be paid some secret compensation, either directly in money or indirected by excessive dividends. Many statesman and publicists have always held the view that publicity would correct all the evils that result from rebating.

It is well to consider also that this company is not a mutual but an ordinary insurance corporation and all of its profits go and belong to the stockholders. The provision in the policies under consideration simply has the effect of " loading " the premiums to the extent indicated therein, and the result is that the stockholders, and they alone, are made to pay this $1 per thousand, or as we have said, the premiums are " loaded " to

the extent indicated, correspondingly decreasing the dividends to the stockholders.

*Mayes & Longstreet,* for appellee.

The obnoxious provisions of the policy are referred to in the body of the covenants, and are especially enumerated in clauses 1, 2, 3, and 4 on the third page of the policy, and are designated " Special Income." These special income provisions are made a part of the whole contract by general allusion and provision in the body of the policy itself.

A careful reading of these four special " income clauses " will satisfy the court that the scheme there provided for violates the provisions of § 2600 of the Code of 1906, and is in contravention of sound insurance principles and against the public policy of this and other states.

In more than one instance in the brief of appellant, and in more than one admission in the argument of distinguished counsel before this court, it is intimated that the effect of the provisions may in some way in future produce the discrimination condemned by § 2600, though the present contention is that whatever may be the results in future, and whatever may be the rights of some policy holder in this company to complain against this scheme in future, there is no policy holder who can complain. It is urged that the court should defer prohibitory action until after the scheme declared by these special income clauses shall operate to the hardship of a policy holder.

The reasons why these income clauses violate the statutes of this state and the policy of the state, may be briefly stated:

Section 2600 declares that no form of insurance shall be written in this state which " shall make any distinction or discrimination in favor of individuals of the same class and equal expectation of life, in the amount of payments of premiums or rates charged for policies of life or endowment insurance, or in the dividend *or other benefits payable thereon.*"

The fundamental principle of this section on the point now under consideration, is, that every policy holder holding the same sort of insurance, shall pay precisely the same rate and obtain precisely the same benefits. Of course the statute does not prohibit the separation of individuals and policies into classes as urged by counsel in his argument. It is perfectly legitimate under this section to provide ten-year payment policies, twenty-year payment policies, five-year dividend policies, annual dividend policies, return premium policies, endowment policies, and policies providing for annuities, etc. These divisions of separate contracts of insurance are recognized by the insurance world and sanctioned by our law. It is a misconception to say that the argument against the special income clauses would deny even the right to make classes by an insurance company. What the statute does mean, is this, however: that every holder of an endowment policy of the same class and expectation of life shall pay the same rate and shall enjoy the same benefits and advantages conceded to every holder of the same sort of endowment policy who belongs to the same class. It does not mean that the holder of every limited payment policy shall have a right to demand and enjoy all the benefits provided for every holder of an endowment policy, but it means that insurance of the same class shall pay the same rate and enjoy the same benefit as every other limited payment policy, the rate being fixed on the basis of age and mortuary tables.

This court will understand, of course, that the word " class " when used by an insurance company has a special technical significance. Insurance companies divide insurers into classes according to age, kind of policy, and periods during which the insurance is acquired. There are variations of these general propositions, but holders of the same character of insurance, or holders of insurance who acquire it during particular periods, are grouped into classes so that all the benefits derivable from a certain property and kind of policies shall be enjoyed by the

members of the particular class which when once formed remains unchanged except by death or forfeitures. We state this without elaboration in order to suggest to the court what is meant by " a class " in insurance. We do not here explain the minor differences which are provided for in the insurance schemes of different companies. But the word " class " in our statute means a general class such as that defined by us above.

Now what is the practical effect of the income clauses of the Great Western Life? Simply stated, it is this: Every insurer and all insurers of the same class and expectation of life who apply for insurance before the $15,000,000 of insurance referred to is written, are given special and continuing benefits which will be continued and must be continued but are denied to holders of the same sort of insurance, same class, same expectation, which may be issued by the same company after the fifteen millions provided for has been written.

In other words, the holder of a ten-year endowment policy before the closing of the fifteen million, derives benefits and advantages which a holder of the very same sort of policy, a ten-year endowment, and of the very same class and expectation in life, who obtains his insurance after the fifteen million of insurance has been written, cannot obtain from or have conceded to him by the Great Western Life.

The holder of a twenty-year limited payment policy, thirty-one years of age, and paying the premium for that age, who has obtained his twenty years limited policy before the fifteen millions of insurance has been written, has provided to him continuing benefits for ten years which cannot be granted to a policy holder in Mississippi who obtains from the Great Western Life a twenty-year payment policy, age thirty-one, paying the same age premium, after the fifteen million is written.

The petition in this cause avers that the fifteen million of insurance will be written by the first of January, 1908, and the demurrer admits this fact. We do not deem it improper

on this question of great public interest to submit to this court the personal statement of the general officer of the Great Western Life that the fifteen million of insurance has already been written in the short time which has elapsed since the organization of this company, and that now other insurance at the rate of ninety million per annum is being written by this company, seventy-five million of which cannot have this benefit included in its terms. The court will perceive, in other words, that out of every premium paid on a new application for insurance, the person who obtains insurance after the fifteen million shall be written, are practically taxed for the benefit of the first fifteen million of insurance, and this will continue indefinitely. If it were not so, the contract would be a deceptive contract.

We take sharp issue with counsel on the proposition that the effect can only be complained of in future by some policy holder who obtains insurance after the fifteen millions have been written. In other words, our proposition to the court is this: That whenever a present contract is made with binding effect provided, extending from the organization of the company until the first of January, 1918, is signed and issued, it is a present contract which may be availed of by an insurer on the one hand, or complained against by the state before a dollar of insurance is written after the fifteen million is completed.

In other words, this insurance company pledges itself in this particular policy and it has pledged itself, to continue writing the same sort of insurance until the first of January, 1918, and to grant to persons who obtain insurance of the fifteen million, these extraordinary benefits from these policies. Would this insurance company be heard to say in this state that after selling such a contract of insurance it proposes to discontinue the writing of any other insurance? To do this would be a fraud on every policy holder who has ever taken a policy in the company. Therefore, the present effect of the contract is to pledge the company to continue the writing of this insurance with this discrimination in it.

We may accept it then as a fact that this is a present contract with all these elements in it, a contract which the life insurance company would not be permitted to violate, and which if they depart from is a violation. If it is a present entire contract which shall remain in effect until January, 1918, then the state can take cognizance of it as an entire contract and say that the form of insurance is vicious and illegal, essentially dangerous and unsound, and we will stop this violation of law before you shall have opportunity to make your act a complete one.

What avail would it be to the state to wait for ten years and then to say to this insurance company, " You have wilfully and persistently violated the law of Mississippi; every policy you have written since the 15th day of November, 1907, has been in violation of law."

Counsel argue that even if it be admitted that the contract is discriminatory and violative of the law of Mississippi, that this court is powerless to grant relief for two reasons:

1. That the insurance commissioner under the advice of the attorney-general when this company first applied for admission into the state, granted it privilege license to do business in the state on the forms of insurance submitted with the application for admission, and that this action on the part of the insurance commissioner was final and conclusive on him; that it is *res adjudicata* and now precludes the commissioner from any action until after the period of the license shall expire. The counsel for appellant cited this court to many cases holding that the judgments of courts are final, and that the judgments of those tribunals which exercise judicial or *quasi*-judicial functions, are always treated as final and conclusive. They cite the court to many of these cases in the brief, but we submit to the court that the fallacy of this argument consists in the misconception of the duties and powers of the insurance commissioner of Mississippi.

Whenever a court of record pronounces a judgment it may be avoided, if improper, in one of two ways:

It may be set aside by the trial court on motion for new trial; or on default it may be revised by an appellate court. It is final unless avoided in one of these ways. This is true of actions by boards of supervisors. In the case of a justice of the peace in this state the judgments are final when pronounced, so far as the justice is concerned, because there is no provision for new trials in that court.

The functions of the court are ended when the trial judge declares that the judgment shall remain unchanged, but this rule does not apply to the insurance commissioner for the simple reason that his duties with respect to a particular insurance company which may have been licensed does not end with the grant of a privilege license. He is expressly charged by law with the duty of a constant and continued watch over the insurance company; he is a perpetual supervisor of the particular company and his duties and authorities are continued during the whole period of the business of the company in the state. At any moment long after the grant of the license, if he becomes satisfied that the work of the insurance company is in violation of the law of the state, it is his duty affirmatively to interfere and to suspend it from business and to exclude it from the state unless it shall discontinue the illegal practice.

Section 2600, in its concluding clause, expressly declares that whenever it shall appear to the satisfaction of the commissioner, after hearing, etc., it shall be the duty of the commissioner to revoke, etc. The commissioner does not wash his hands of the insurance company and of its operations as soon as he may have granted the company privilege license to do business in the state, but he is charged with the continuing duty to jealously guard the law and protect insurers. His duties in this case are like unto those of a chancellor in guardianships. His court is always open and his orders are always subject to revision and revocation, and this is the distinction which obtains with respect to his functions and powers and duties and those of an ordinary

court of record or of a tribunal exercising functions *quasi-judicial*.

The court will here observe that the finding of the commissioner in the first instance, and the state of action here presented to the court, was not and is not now presented on an issue and controversy of facts. The facts are practically admitted. It is the applications of principles of law to the written contract and to the stipulations and effects of it which demand the consideration of this court in this issue.

To argue that the grant of privilege license on payment of the proper sum, to the Great Western Life Insurance Co. made their right to do any sort of business in this state unquestionable for the full term of the licensed period, strikes us as so untenable as hardly to justify argument. A positive statute of this state, § 3893 of the Code of 1906, expressly provides in relation to privilege taxes, as follows:

" Nothing in this chapter, nor the payment of any privilege tax herein provided, shall legalize any business, employment, transaction, article or device, of any kind or the operation thereof, in violation of any statute of the state, or the ordinance of any municipality therein now existing or that may be hereafter adopted."

We have abundant authority in this state for the proposition that the mere obtaining of a privilege license on payment of the legal fee, does not warrant the continuance of an unlawful business. The proposition is so well established in Mississippi, and in the courts of the land, that we deem it unnecessary to cite authorities on it.

Therefore, for the two reasons stated, first that the duties and powers of the commissioner are continuing duties and powers, and secondly, for the reason that no violation of law can be legalized by privilege license under our statutes, counsel's contention that the action of the commissioner was *res adjudicata,* cannot be sustained.

In the second place, counsel argue that even if the policies and provisions of the income clauses are violative of the law, that this court must reverse the judgment and dismiss the petition because of lack of jurisdiction in the circuit court to entertain the petition for mandamus against the insurance commissioner and grant any order thereon.

We call the attention of the court to § 3231 of the Code of 1906 which enlarges the rights of courts with respects to writs of mandamus, and brings within the operation of the writ a large class of tribunals, corporations, officers and persons who could not be controlled by the writ under the common law.

In this case we have the insurance commissioner of this state admittedly asserting and believing that the forms of insurance being offered and written by the Great Western Life are in violation of the law, and yet we have the admitted statement that notwithstanding this is his judgment, he declined to even order a hearing because of the opinion of the attorney-general that he is precluded from a reconsideration of the policy and its effects for the term of the licensed period. Will it be maintained that under the given state of case, the insurance commissioner cannot be compelled by mandamus to perform his duty and to proceed? So far as the state of Mississippi is concerned, it is indifferent whether this court shall affirm the order of the circuit court directing the commissioner to require the Great Western Life Insurance Co. to discontinue this vicious form of insurance, or shall only affirm that portion of the order requiring the insurance commissioner to proceed to a hearing and determination of the issue. The main object of the presentation of this issue is to compel action of some character which will enable the commissioner to protect the people of the state from this illegal insurance, which, by the admission of its own general officer in this state, is now being written at the rate of ninety million per annum. Every day's grace conceded to this insurance company enables it to work greater imposition upon the people of the state.

It is true that by a long line of authorities in Mississippi, it has been repeatedly held that where a discretion is left to an inferior tribunal the superior court may only direct the inferior tribunal to proceed to a consideration of the matter and action in the premises but cannot control the discretion. These cases begin with *Madison County* v. *Alexander,* Walker, 523, the very first report ever published of judicial decisions in Mississippi, and continue down through the reports to *Monroe County* v. *State,* in 63 Miss., and to *Harrison County* v. *Barber and others,* unreported. But our contention is that with the facts admitted, with the policies before the insurance commissioner, with only the question confronting them of whether or not the admitted policy is in violation of law, and with the refusal of the insurance commissioner to act in any wise because of the opinion of the attorney-general, there is no room for discretion.

In the face of the law the commissioner has not the power to exercise discretion and it was within the function of the court on the admissions made by the demurrer, to order the commissioner to revoke or to require a suspension of the writing of the particular forms of insurance.

But if this court should be of opinion that the lower court exceeded its powers by a peremptory instruction to revoke, we submit that with an expression of views of this court as to the legality of the contract of insurance and of the attitude of the commissioner if he is convinced of its illegality to order a hearing and to act as the facts shall justify, it will answer the ends of justice. This would necessitate an affirmance in part and a reversal in part of the judgment of the court below.

Argued orally by *Thomas A. McWillie,* for appellant, and by *James C. Longstreet,* for appellee.

WHITFIELD, C. J., delivered the opinion of the court.

We are all clearly of the opinion that the income features of

the policy under consideration operate an illegal discrimination, and are violative of the provisions of our insurance statute. No amount of ingenuity can obscure the fact that such is the purpose, and such the effect, of these income feature clauses.

This proceeding, however, was begun by mandamus, and the prayer of the petition is that " the commissioner of insurance be commanded to reconsider the policy and application of the insurance company, and to revoke and annul the license to do business in this state heretofore granted "; and this prayer is based upon the ground, as alleged, that " such license was granted by the commissioner by mistake of law, as applied to such policies; that the same was revocable and should be revoked," etc., and praying the court to command the insurance commissioner to " review and reconsider the application, and, if it should appear that such provisions in the policies of insurance issued by the insurance company did violate the provisions of § 2600 of the Code of 1906, then that the commissioner should be required to revoke and cancel the license of such company to do business in the state, and to exclude the same from the state of Mississippi." The prayer, it is seen upon close analysis, is twofold: First, that the commissioner should be required to review and reconsider the policy which he had already reviewed, considered, and acted upon; second, that if he should find, from the face of the policy, the income features to be in violation of our insurance law, then that he should revoke the license, etc. It is perfectly clear that the first part of this prayer, that the court should require the commissioner to review and reconsider the policy, is simply a prayer that the court should require the commissioner to do what he had already done. It is not asked that any evidence dehors the policy should be looked to. No such evidence was introduced. The whole evidence in this case, under this prayer, is just the face of the policy, the identical policy the commissioner had before him when he did originally review and consider the policy, and determined to grant the license, which he did there-

after issue to the company, and under which it entered upon its business in this state, relying upon that decision of the commissioner. It is, as we think, perfectly clear that no mandamus could lie to accomplish this object. The commissioner acted judicially in granting the license originally. He was not performing a mere ministerial duty, or doing a mere clerical act. He was reviewing and considering these very income features and other features of this policy, and deciding upon the law applicable to these features, and determining, as a judge would determine, whether they violated any of the provisions of our insurance statute. It is too plain for argument that he did act in this capacity judicially. Having once, in the exercise of judicial power, reviewed and considered the policy on its face, and decided, as a judge would decide, that it did not violate any of the provisions of our laws, and having, in pursuance of that, issued the license to it to do business in this state, and the company having, upon the faith of that decision, incurred expense and entered upon its business in this state for the one year which is the life of the license, the commissioner can no more be called upon to do over that identical thing. But it is said that this statute prescribes two duties: First, the duty to determine whether the license should be granted originally; and, second, to revoke the license although granted, if thereafter the company should be guilty of conduct authorizing its revocation. We think this is a perfectly correct statement of the meaning of this § 2600, but it is perfectly obvious that the effort here to have this license revoked is not because of anything that the company has done since the license was granted which the commissioner did not know it was going to do at the time he granted such license. The very thing which he determined — wrongly, it is true — at the outset, was that these income features appearing on the face of the policy itself did not violate our laws or public policy, and this he determined on the face of the policy, unaided by proof. Is now this application to exercise what is called his second duty — to revoke this

license — founded on anything in the world except the face of the policy? Manifestly not. Is there any evidence dehors the policy offered to show that the company has done anything except what the policy sought to authorize it to do, and the commissioner determined it might lawfully do, when he granted the license? Not one particle of such evidence. So that, in the grip of a clear common-sense consideration of what is here precisely involved on principle, it is clear that, practically, the commissioner is simply sought to be required to revoke the license, not for anything done since the license was granted, not considered by the commissioner, but merely because it is putting into effect the very income features which the commissioner originally decided were not violative of our laws or public policy. In short, it is an effort, not to revoke the license for wrongful conduct subsequent to the granting of the license violative of our laws or public policy, but to revoke the license on the very identical grounds which the commissioner has already determined would not authorize a denial of the license. The court would be placing the commissioner in a very singular situation, and the state of Mississippi in an extremely awkward attitude, if it should now hold that the commissioner should be required to revoke the license, on the very grounds, and no other, which the commissioner held insufficient to authorize a denial of the license. We are, therefore, clearly of the opinion that, in this proceeding by mandamus, the commissioner cannot be required to reconsider, or review, his first action in granting the license, and to revoke it, on the mere face of the policy, which policy he had before him at first, when there is no evidence of any kind, dehors the policy, to show any wrongful or illegal conduct on the part of the company subsequent to the granting of the license which might serve properly as a ground of revocation, and when it is plain that the effect would be, not to compel the commissioner to perform a mere clerical act, but to compel him to act in the way the court commanded him to act — an effort, in other words, to control his discretion.

The court below, in sustaining the mandamus, entered a judgment revoking the license.

From what we have said, it is clear that the matter is *res adjudicata,* and that the judgment of the court below should be, and it is hereby, reversed and the proceeding dismissed.

CALHOON, J. delivered the following concurring opinion.

While fully concurring in the conclusion, I have not decided in my own mind that the policy of insurance in question is violative of any statute of the state of Mississippi.